# THE STATE v. WILLIAM WILSON, Appellant.

### Division Two, November 23, 1909.

1. **WITNESSES: New: Indorsed on Indictment: No Motion, Surprise or Continuance.** The indorsement on the information, after the case has been called for trial, of the names of material witnesses, where there was no motion to quash the information, and defendant made no complaint that he was taken by surprise and made no application for a continuance for a sufficient length of time to enable him to investigate concerning them, and all he did was to object to the indorsement and to except to the court's ruling permitting the names to be so indorsed, was not reversible error.

2. **CONFESSIONS: Necessary Elements.** Where the officers held out to defendant no flattery of hope or promise of immunity and used no threats and pursued no improper conduct to induce him to make a confession that he killed deceased, such confession is admissible in evidence on behalf of the State.

3. **DEFENDANT: Cross-Examination: Confessions.** Defendant can only be cross-examined upon matters referred to in his examination in chief; but where defendant, in his testimony in chief, testified that he made the confessions testified to by the State's witnesses, and also the written confession signed by him, but said the first were obtained by threats and duress, and that he did not know the contents of the written confession, he thereby opened a wide field for cross-examination, and it was proper to permit the State to cross-examine him fully as to the facts stated in the confessions.

4. **EVIDENCE: Instrument of Death: Rope.** Where defendant confessed that he tied a rope around deceased's neck and dragged her, and a physician testified that her death was due to strangulation, and a witness fully identifies the rope as being the one found about the neck of deceased, it was proper to permit the State to introduce such rope in evidence.

5. **ATTORNEYS: Improper Remarks: Preservation for Review.** If the bill of exceptions fails to preserve objections and exceptions to an argument to the jury of an attorney for the State in a prosecution for murder, the impropriety of such remarks is not for review upon appeal.

6. ———**: Former Counsel for Defendant.** Where the defendant interposed an objection to an attorney sitting as counsel on behalf of the State on the ground that he had formerly been defendant's counsel, and the court sustained the objection, the

court did what it could to protect defendant's rights, and there is no merit in the assignment that the attorney for defendant at his preliminary hearing took a seat at the counsel table for the State and began to assist the prosecuting attorney to select a jury.

7. NEWLY DISCOVERED EVIDENCE: Affidavit.    An affidavit by the attorney for defendant that newly-discovered evidence in his behalf has been obtained, naming the witnesses and reciting what they would testify, is not sufficient to authorize a new trial.    Such affidavits must be made by defendant himself and by the witnesses by whom he expects to establish the facts alleged to have been newly discovered.

8. INSTRUCTIONS: Statements Made by Defendant.    An instruction in the usual form, telling the jury that "what defendant said against himself the law presumes to be true, because said against himself," and "what the defendant said for himself the jury are not bound to believe because it was said in a statement proved by the State," etc., is again held to be unquestionable law.

9. MURDER: In First Degree: Hanging: Sufficient Evidence. Deceased, a white girl, was a cook for a traveling show, and defendant, a negro, was also an employee.  She was found dead beside an empty box car about 1:45 a. m., a small rope about her neck, her face, body and clothes indicating that she had been dragged, and the physician testified her death was due to strangulation.    Defendant was arrested about two o'clock, at first denied his guilt, then confessed to the officers that he went to the car where the girl was sleeping, went in and made an indecent proposal to her; that she refused, and sprang out of bed, and he struck her in the jaw, and she fell "senseless;" that he took her on his shoulder, carried her about one hundred yards, and becoming exhausted put her down and dragged her by the rope about the same distance to the car, his purpose being to put her on, tie the rope to indicate she had committed suicide, and close the door and let the car be hauled out of town; that when he reached the car, he heard some one move in it, saw some tramps therein, and ran away, leaving her lying on the ground.    In the presence of witnesses he made the same confession the next day to the prosecuting attorney, who wrote it down, and he signed it.    In subsequent statements he said when he made the proposal to the girl, she jumped out of bed, and tried to cut him with a butcher knife, and when he struck her on the jaw she again tried to cut him with the knife, and then he hit her on the neck.    Held, sufficient to support a verdict of murder in the first degree, assessing the punishment at hanging.

Appeal from Jasper Circuit Court.—*Hon. D. E. Blair,* Judge.

AFFIRMED.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

(1) Appellant complains because the court permitted the prosecuting attorney to indorse the names of the witnesses, Frank Ross, Wm. Weaver, H. L. Bright and Dr. E. H. Baird, on the information on the day of the trial. We only find in the record an objection by counsel for appellant, and an exception to the ruling of the court in permitting said names to be indorsed on the information by the prosecuting attorney. Counsel for appellant did not move for a continuance by reason of surprise by the adding of said names to the information, nor did they move to quash the information by reason of said names being added thereto. Hence there is nothing for the court to review on this assignment. If any error was committed, it was waived. State v. Myers, 198 Mo. 243; State v. Barrington, 198 Mo. 66; State v. Bailey, 190 Mo. 278; State v. Henderson, 186 Mo. 482. (2) The confession was properly admitted in evidence. In the case at bar there was evidence on the preliminary examination (with the jury excluded) to ascertain whether said confessions were obtained by improper inducements held out to appellant. And in the absence of any improper conduct on the part of the officers to induce such confessions by flattery of hope, promise of immunity, or use of threats, the confession was properly admitted in evidence. State v. Brooks, 220 Mo. 74; State v. Wooley, 215 Mo. 682; State v. Spaugh, 200 Mo. 596; State v. Hottman, 196 Mo. 127; State v. Barrington, 198 Mo. 109; State v. Ruck, 194 Mo. 437; State v. Patterson, 73 Mo. 695; State v. Jones, 171

Mo. 406; State v. Brennan, 164 Mo. 487; State v. Stebbins, 188 Mo. 387; State v. Kennedy, 177 Mo. 98; State v. Hapkirk, 84 Mo. 278. (3) Appellant assigns error in that he was cross-examined about matters not testified to in chief. Appellant, in his testimony in chief, stated that he made the confessions at Carl Junction as testified to by different witnesses; also, that he signed the written confession to Judge Bright, but claimed that the first confessions were obtained by threats and duress, and that he did not know the contents of the written confession. It was competent for the State to cross-examine appellant as to all of these facts. He was not cross-examined as to a single fact about which he did not testify in chief, as shown by the record. State v. Miller, 190 Mo. 462; State v. Avery, 113 Mo. 498; State v. Wartz, 191 Mo. 579; State v. Barrington, 198 Mo. 71; State v. Miller, 156 Mo. 85; State v. West, 95 Mo. 142; State v. Kennade, 121 Mo. 414; State v. Anderson, 126 Mo. 546; State v. Grant, 144 Mo. 64. (4) The law, as declared in instruction 7, has been the law of this State since the early case of State v. Hays, 23 Mo. 287; State v. Dorrah, 152 Mo. 541; State v. Carlisle, 57 Mo. 102; State v. Brown, 104 Mo. 365; State v. Wisdom, 119 Mo. 552; State v. Young, 119 Mo. 525; State v. Peak, 85 Mo. 192; State v. Curtis, 70 Mo. 594; State v. Talbot, 73 Mo. 347; State v. Walker, 98 Mo. 108; State v. Cushenberry, 157 Mo. 188; State v. Howell, 117 Mo. 307; State v. McKenzie, 144 Mo. 44. (5) Appellant assigns newly-discovered evidence as a reason in his motion for a new trial, and attaches an affidavit verified by Walter B. Sayler, one of the attorneys for appellant in the trial court below. This assignment of error cannot be considered because the affidavit is not supported by the oath of appellant, or the persons named in said affidavit. The affidavit made by counsel for appellant is not sufficient. State v. Flutcher, 166 Mo.

587; State v. Neasby, 188 Mo. 472; State v. Miller, 144 Mo. 30; State v. Bowman, 161 Mo. 94.

FOX, J.—The defendant in this cause was charged by information of the prosecuting attorney of Jasper county, which was duly verified, with murder of the first degree. The party charged to have been killed was one Millie Plum, and the offense was alleged to have been committed on July 12, 1908, at Carl Junction, Jasper county, Missouri. The information embraces four counts, each of which charges murder of the first degree, and doubtless were embraced in the information to meet the different phases of the testimony which might be introduced upon the trial of the cause. From a judgment of conviction in the Jasper Circuit Court of the offense charged the cause is brought to this court and is now pending here upon appeal from such judgment.

The testimony introduced upon the trial of this cause substantially tended to prove the following state of facts:

Defendant, William Wilson, is a negro, was about twenty-four years old at the date of the trial, and a native of Lafayette, Louisiana. In the spring months of 1908 the Miller Carnival Company was showing at Lafayette, and this defendant joined said company at that place and remained as one of the employees of said company until the date of his arrest at Carl Junction for the murder of deceased. The deceased, Millie Plum, joined said Miller Carnival Company at Weir City, Kansas, as an employee in the capacity of a cook, about one week prior to her death. It appears that said Miller Carnival Company had been at Carl Junction for a few days, taking part in a street fair, and closed its engagement late Saturday night, July 11th, and was getting ready to leave on the following day. Said company traveled by railroad; it had one car of

223 Sup—12

its own, divided into compartments, one of which was occupied by the Miller family, one for the private dining-room of the Miller family, one for the general dining-room of the carnival employees, and an extra car of the railroad company was used in conveying their property from town to town.

The body of the deceased, Millie Plum, was found near an empty box car of the Frisco railroad at about 1:45 Sunday morning, July 12, 1908. When found a rope was tied around her neck; her face was downward; a bruise was found on her left cheek; a cut around her neck five inches long, but not deep; she had on a thin skirt and a gauze shirt waist. The body had been dragged a distance of about one hundred yards on the ground. The distance of the body from the Miller car was something like two hundred yards. Her hands and feet showed signs that she had been dragged face downward, and the skin on the hands and feet was broken and worn. Woman's hair was found on the railroad track where the body had been dragged; a lady's comb was found about thirty feet from the Miller car. Sock-feet tracks of a man with flat insteps were found leading back to the Miller car; the size of the footprints corresponded to defendant's feet. Defendant was arrested in the Miller car soon after the body of the deceased was found, which was near the hour of 2 o'clock in the morning, and when first arrested he denied that he had killed deceased, but while in the city calaboose at Carl Junction, and only a few hours after his arrest, defendant confessed to the crime of killing deceased. After defendant was taken to the county jail at Carthage, and on that Sunday afternoon, he made a sworn, written confession to Judge Bright, who was then assistant prosecuting attorney, telling him how this crime was committed, which written confession is as follows:

"State of Missouri, County of Jasper, ss.

"William Wilson, being duly sworn, upon his oath states: My name is William Wilson. I am 24 years old. I was born in South Carolina. I joined the J. G. Miller Carnival Company January at Lafayette, Louisiana. We showed at Weir City, Kansas, last week. My duty was working at the merry-go-round and at the boarding car. At Weir City a white woman, whom they called Millie Plum, joined the carnival company. We went from Weir City to Carl Junction. We showed there last week, and we showed there the last time Saturday night, and expected to leave there Sunday morning. This white woman I mentioned cooked for the members of the company. About midnight Saturday night, July, 11, 1908, I went into the car of the carnival company where Millie Plum slept. I took off my shoes. She was lying down. I asked her to let me have sexual intercourse with her. She refused. Then I hit her on the jaw, and knocked her down. I then carried her out of the car and for about 100 yards from the car. I then tied a rope around her neck and dragged her some distance to an empty box car. I tried to put her into the box car, but she was too heavy. I wanted to put her into the box car to hide her. She never hit me or cut me at any time.

"When first arrested I denied having killed Millie Plum.

"I make this statement under oath and of my own free will and accord, voluntarily and without any duress or restraint whatever and without any hope or promise of clemency of any kind.     WILLIE WILSON.

"Subscribed and sworn to before me this 12th day of July, 1908.     .     HENRY L. BRIGHT,

"Notary Public.

"My commission expires July 28, 1911.

"Witness: Wm. Weaver.

" (Seal.)"

Dr. A. L. Carpenter, a witness for the State, who examined the body of deceased early on the morning it was found, testified as follows:

"Q. There was a question I intended to ask you. What was the condition of the body as to whether or not it was alive or dead? A. It was unquestionably dead.

"Q. Now, after making an examination, Doctor, of the body contusions and bruises and the rope around the neck, what, in your opinion, was the cause of death? A. Dragging it up there with the rope; it was strangulation.

"Q. You say, Doctor, it was caused by strangulation? A. Yes, sir.

"Q. That was produced by what? A. By dragging her along on her face.

"Q. That produced death? A. ·Yes, sir. I think she was struck a blow on the side of the head first.

"Q. Was the blow on the side of the head sufficient to cause death? A.· I don't think so.

"Q. Then, in your opinion as a medical man, you should say it was caused by strangulation? A. Yes, sir."

H. O. Barnard, witness for the State and the city marshal of Carl Junction at the date of this crime, and who arrested defendant, testified to defendant's confession to him as follows:

"Q. Go ahead, now Mr. Barnard, tell what he said there—use his language. A. He said she come at him with a butcher knife, and he knocked her down, and did this either two or three times—I wouldn't be positive ·which—and he knocked her down each time, and he said he thought he had killed her, and taken her on his shoulder; at any rate, he carried her from the car about a hundred yards west up the railroad track, and said he was tired carrying her, and he laid her down and drug her about another hundred yards to an empty box car that was standing on the siding there,

and said he intended to put her in that car and close
the door, and possibly she would be taken out before
it was discovered.

"Q. What else did he say, if anything, about how
he dragged her? A. He drug her with a rope he had
around her neck, a rope eight or ten feet long.

"Q. Describe that rope? A. It was a small rope,
I don't know just what kind it was, I don't think it
would exceed half-an-inch rope, and possibly eight or
ten feet long."

Frank R. Ross, a witness for the State, testified
to a confession made by defendant to him, as follows:

"Q. Do you remember the time Millie Plum was
killed over at Carl Junction? A. I remember the cir-
cumstances; I don't remember the exact date.

"Q. How long was it after that time you saw the
defendant, William Wilson? A. About three o'clock
that afternoon.

"Q. Where did you see the defendant at that
time? A. In the county jail of Jasper county.

"Q. Have any conversation at that time as to
how this killing took place? A. I did.

"Q. State to the jury what the defendant said?
A. Well, he said he went to the car where this girl
was sleeping and made a proposition to her and she re-
sented it, and she came at him with a butcher knife
and he struck her in the face, or neck, right back here
some place, and knocked her down, and after question-
ing him several times over that, telling him to repeat
it, he finally denied the butcher knife. He said he
struck her on the side of the jaw or neck and knocked
her down and thinking he had killed her he picked her
up and took her out, I believe, the side door to the car
and carried her some seventy-five or one hundred
yards. He had a rope that he had been tying some
papers together with, and he put that around her
neck and dragged her that much further to put her
in a car, thinking he would fasten the car up and

possibly she would be shipped out and no one would ever know where she went to, but after he got there he was pretty well out of wind and! as well as I remember now, he said some two or three tramps were in the car and that frightened him and he left her at the side of the car and went back to the car and went to bed.

"Q. What car did he go back to? A. Where this girl was sleeping or the car that belonged to the Miller Carnival Company."

J. W. Jackson, a witness for the State, testified to the following confession made to him by defendant:

"Q. What did he say? A. He says, 'I can't help it, I never done it.'

"Q. What else did he say, if anything? A. Mr. Miller, or Mr. Barnard—I wouldn't be positive which— says: 'Well, the girl come too, Bill, and regained consciousness,' and he said, 'She admitted to us and told us that you was the one that done it before she died.'

"Q. What did he say? A. He still denied it again, and he said he couldn't help what she said, he never done it, and Miller spoke up and says, 'Bill, whatever induced you to do that?' he says, 'you must undoubtedly have had some provocation or you wouldn't have done it.' And he says, 'Well, I tell you, Mr. Miller,' he says, 'went back to where she was laying and made a proposal to her and she jumped out of where she was laying and come at me with a knife and I struck her in the jaw and knocked her down and she come at me again and I run and she followed me out of the car and! she run at me again and I knocked her down again and she got up and fought at me and still struck at me with this knife and I knocked her down again and knocked her senseless,' and I think, if I am not mistaken, Mr. Miller says, 'You knocked her senseless,' and he says, 'Yes, and then I picked her up and put her on my shoulder and carried her as far as I could and then put this rope around her neck and drug her.'

And some of the boys asked him what made him do that, or what was he going to do, and he said he was going to put her in that car, and he said she was too heavy, he couldn't get her in.''

William Weaver, deputy sheriff, testified to the following confession as made by defendant to him:

''Q.  Did you have any conversation with the defendant in regard to the killing of Millie Plum?  A. Yes, sir; several conversations with him.

''Q.  Tell the jury what they were—what he said? A.  The first conversation I had with the defendant was in the afternoon of July 12th, somewhere about five o'clock, probably a little later.  It was in the trusty room in the county jail.  After the defendant was brought to the jail on the morning of the 12th, being my Sunday off, I left and went to Carl Junction for the purpose of investigating the murder that had been committed down there, and I came back to the jail in the afternoon.  Mr. Bright, the then assistant prosecuting attorney, and Mr. Ross, in charge of the jail on that day, and the defendant were in the trusty room together.  Mr. Bright had come down, I suppose, for the purpose of getting a statement from the defendant—what he knew about the matter.  They were together when I arrived at the jail and I immediately went into the room where they were and became interested in the conversation.  Being questioned by Mr. Bright, the defendant made a statement; that is, he commenced to make a statement as to what he knew about the matter, and he made the statement as it was repeated to me by the constable as he had before that made it to him, and I spoke up to the defendant and told him, I says, 'You are lying about this, you are not telling the truth, you had better come clean because we have got the evidence.'.  Then Mr. Bright instructed him to make a statement as to what he knew about the matter.  Then he made a statement which was written down by Mr. Bright and later signed by the defendant

after having been read over twice, and it was read over after he signed it, by Mr. Bright.

"Q. I hand you Exhibit A, Mr. Weaver, and ask you if that is the statement? A. Yes, sir; that is the statement he signed and my own signature here as a witness.

"Q. Now, Mr. Weaver, subsequent to that statement, did you have any conversation with the defendant? A. Yes, sir.

"Q. State to the jury what that was? A. It was on the morning, Tuesday morning following, at about one o'clock, in the morning.

"Q. This was on Sunday? A. Yes, Sunday afternoon. On the Tuesday morning following at about one o'clock in the morning, for certain reasons I went to the cell where the defendant was confined, and he was lying on a bunk, apparently asleep. I touched him on the shoulder and says, 'Billy, get up, put on your clothes and follow me and don't ask any questions nor speak a word,' and he done so. I took the defendant into the outer room and left him in charge of Deputy Sheriff Cale and went to the barn and hitched up my rig. Mr. Cale took the colored man out of the jail and met me at the corner of 5th and Fulton streets. The defendant got in the buggy with me and during this ride I had another conversation with the colored man. After we got out in the edge of town, I says, 'Billy, tell me all there is to this thing,' and he went over practically the same statement he made here where he signed. His statement was to the effect that he went into the apartment of the girl—

"Mr. Sayler: We object to that.

"The Court: Overruled.

"Mr. Sayler: We except.

"He told me he went into the apartment of the girl where this white woman, Millie Plum, as I understand her to be, was sleeping, for the purpose—he used the term—doing business with her. He made a propo-

sal to her and she was lying on the bed at the time. She resented the proposition and jumped out of the bed and he said he struck her with his fist on the head or neck and she fell to the floor. He said he thought he had killed her. There was a piece of rope he said lying there, and he tied that around her neck and dragged her to the side door of the car and took her on his shoulder. He said he carried her up the railroad track west until he became exhausted and laid the body down on the ground, and he said at that point he saw the woman breathing. He said he dragged the body from there to an empty box car, which was about one hundred yards further west. I asked him what he took her there for. He said he intended to hang the body in the car so if it was found it would appear the woman had committed suicide. I asked him why he didn't hang the body in the car and he said he thought he heard something move in the car and left the body on the ground. He also said he was so exhausted he could not have put the body in the car if he tried. I have had other conversations since then, and while there has been other statements made, I don't know as any that would throw any further bearing on the case.''

The defendant testified in his own behalf and he was the only witness who testified on the part of the appellant. His examination and cross-examination is quite voluminous. We have examined it very carefully and in detail and feel that it can serve no good purpose to burden this opinion with a detailed statement of his testimony. It is sufficient to say, after a careful analysis of all his statements, that it amounts to simply this, that he absolutely denies the killing of the deceased and denies the truth of the confessions, and also makes a denial that the confessions were made at all.

At the close of the evidence the court fully instructed the jury upon all the legal propositions to which there was any testimony applicable. It is not essential

to reproduce the instructions, but we shall during the course of the opinion give those, the correctness of which is challenged, such attention as we deem necessary. The cause was submitted to the jury, and after due consideration they returned their verdict finding the defendant guilty of murder in the first degree and assessed his punishment at death. Timely motions for new trial and in arrest of judgment were filed and by the court taken up and overruled. Sentence and judgment were entered of record in conformity to the verdict, and from such judgment the defendant prosecuted this appeal, and the record is now before us for consideration.

## OPINION.

It is apparent from the disclosures of the record that this is a very serious case, being one in which the most severe punishment known to the law was imposed by the judgment of the trial court. Upon the part of the appellant we are not favored with any brief or suggestions respecting the complaints urged by the motion for new trial; however, in obedience to the requirements of the statute we have given the entire record very serious consideration, with the view of determining whether or not there was any reversible error in the trial of this cause. It may not be out of place to say that even in the absence of any statute requiring us to make this investigation the importance of this case would dictate a most careful consideration of every detail during the progress of the trial. There being no suggestions on the part of the appellant, he not being represented in this court, we can only look to the errors as designated in the motion for a new trial.

## I.

In the motion for a new trial it is insisted that the court erred in permitting the State to indorse the names of material witnesses on the information after

the case had been called for trial, over the objections of the defendant, and that the witnesses so indorsed were afterward introduced and examined. In this connection it is asserted in the motion for a new trial that the prosecuting attorney knew from the very time of the homicide that these witnesses were important and material, and it is further stated that these witnesses were not previously known to the defendant to be witnesses against him. Upon this proposition it is sufficient to say that the record does not disclose that there was any motion to quash the information upon the ground that these witnesses were indorsed upon the information at the time of the trial; nor does it appear that the defendant, through his counsel, made any complaint that he was taken by surprise by reason of the additional indorsement upon the information of these witnesses. An examination of the record discloses simply an objection by counsel for appellant to the indorsement of the witnesses and an exception to the ruling of the court in permitting such names to be indorsed on the information by the prosecuting attorney. There was no request for a continuance for a sufficient length of time to investigate concerning the additional witnesses so indorsed.

A similar proposition to the one now under consideration was presented to this court in the comparatively recent cases of State v. Bailey, 190 Mo. l. c. 278; State v. Myers, 198 Mo. l. c. 243; State v. Barrington, 198 Mo. l. c. 66; and it was expressly ruled in those cases, upon disclosures of the records very similar to those in the case at bar, that there was no error in permitting the indorsements to be made. Manifestly the defendant is in no position to complain at the action of the court in the absence of any suggestion of surprise, or an application for a continuance by reason of such surprise, with the view of making an investigation as to the additional witnesses. This proposition was exhaustively treated in the cases of State

v. Myers, State v. Barrington and State v. Bailey, *supra,* as well as in the case of State v. Henderson, 186 Mo. l. c. 482.

## II.

The appellant complains in his motion for a new trial that the court erred in admitting illegal, incompetent, irrelevant and immaterial testimony. This complaint at least partly is directed at the admission of the numerous confessions made by the defendant concerning the commission of this offense. Upon that question it is only necessary to say that the record discloses great care upon the part of the trial court to first ascertain whether or not such confessions were obtained by improper inducements held out to the defendant. The trial court excluded the jury and made a preliminary examination upon the question as to the inducements held out to this defendant to make the confessions, and upon such examination the court ruled that the confessions were voluntary and admissible. In our opinion the action of the court in admitting the confessions of the defendant was entirely proper. The record does not disclose any improper conduct on the part of the officers or any flattery of hope, promise of immunity, or use of threats in order to induce the defendant to make such confessions, hence it follows that the confessions were voluntary and were admissible in evidence. It is hardly necessary to cite authorities upon this proposition; however, it was fully treated of and the rules clearly announced in State v. Brooks, 220 Mo. 74; State v. Wooley, 215 Mo. l. c. 682; State v. Spaugh, 200 Mo. l. c. 596; State v. Hottman, 196 Mo. l. c. 127; State v. Barrington, 198 Mo. l. c. 109; State v. Ruck, 194 Mo. l. c. 437, and numerous other cases. It must be held that there was no error in the admission of the confessions of the defendant in this cause.

Again under this assignment of the admission of illegal and incompetent evidence will be embraced the

complaint lodged in the motion for new trial that the
defendant was "cross-examined about matters not tes-
tified to in chief." We have examined the disclosures
of the record respecting the cross-examination of the
defendant and have reached the conclusion that there
is no merit in this assignment of error. The defend-
ant in his testimony in chief testified that he made the
confessions at Carl Junction as testified to by differ-
ent witnesses, and also that he signed a written con-
fession to Judge Bright, but claimed that the first con-
fessions were obtained by threats and duress, and that
he did not know the contents of the written confession.
This statement upon the part of the defendant opened
a wide field for cross-examination. It was clearly
proper on the part of the State to cross-examine the
defendant fully as to the facts stated in the confessions,
and this is all that was done. We are unable to find in
the disclosures of the record any violation of the statu-
tory rule that the defendant can only be cross-exami-
ned upon matters referred to in his examination in
chief. [State v. Miller, 190 Mo. l. c. 462; State v. Av-
ery, 113 Mo. l. c. 498; State v. Wertz, 191 Mo. l. c. 579,
and numerous other cases.]

The next complaint embraced in the assignment
of errors in the motion for a new trial as to the admis-
sion of improper and incompetent evidence, is that
the State was permitted to introduce the rope found
around the neck of the deceased upon the discovery
of her body. This rope was fully identified by witness
Chas. Roney as being the one found tied around the
neck of the deceased; and one of the physicians testify-
ing in this cause stated that the death of the deceased
may have resulted from strangulation. We are of the
opinion that this rope, after being identified, was clear-
ly admissible in evidence.

### III.

Another complaint urged and insisted upon in
the motion for a new trial is that the court permitted

one of the local attorneys, Mr. Andrews, who was of counsel for the State, to make an improper argument to the jury. Upon this proposition it is sufficient to say that a careful examination of the bill of exceptions fails to disclose a proper preservation of objections and exceptions to the action of the court upon objections during the argument of Mr. Andrews; therefore, we take it that assignment of error is not before the court for review.

## IV.

Appellant also lodges the complaint in his motion for a new trial that one Geo. W. Crowder, who had been the attorney of the defendant in his preliminary hearing in this cause, took a seat at the counsel table for the State and began assisting the prosecuting attorney to select a jury in this cause. A careful consideration of the disclosures of the record makes it manifest that there is no merit in this assignment of error. The record discloses simply this: Mr. Sayler, who was representing the defendant, interposed an objection to Mr. Crowder sitting as counsel on behalf of the State in this trial on account of his being former attorney for the defendant. "By the Court: Objection sustained." This is absolutely all that is embraced in the record concerning Mr. Crowder's participation in this trial. The defendant interposed an objection to his sitting as counsel on behalf of the State in the trial and the court sustained the objection. In other words, the court upon that proposition did what was requested by counsel for appellant. We are of the opinion that there is no merit in that complaint.

## V.

It is insisted in the motion for a new trial and is assigned as one of the reasons why a new trial should be granted, that upon the showing made respecting newly discovered evidence the court should have granted a new trial. The record upon this question discloses that an affidavit was filed by Walter B. Sayler

in support of the motion for new trial asserting that other evidence had been discovered since the trial, detailing in his affidavit the substance of the evidence and the names of the witnesses who would give such evidence. It fully answers the assignment of error upon this proposition to simply suggest that the affidavit upon the subject of newly-discovered evidence is not supported by the oath of the appellant nor are there any affidavits filed by the witnesses who it is alleged would give certain evidence upon a new trial of this cause. The uniform rulings of this court upon that proposition are that the affidavit by counsel for appellant upon the subject of newly-discovered evidence is insufficient. In order to fully meet the requirements of the law as announced by this court in an unbroken line of decisions, the affidavit detailing the newly discovered evidence must have the support of the appellant himself as well as the witnesses by whom he expects to establish the facts he alleges have been newly discovered. It really is not necessary to cite authorities upon this question, but the cases of State v. Flutcher, 166 Mo. 1. c. 587; State v. Neasby, 188 Mo. 1. c. 472; State v. Miller, 144 Mo. 1. c. 30; State v. Bowman, 161 Mo. 1. c. 94, fully treat of that question and correctly state the rules of law which have uniformly been applied to it.

VI.

The motion for new trial by the appellant directs attention to but one instruction of which it complains of the action of the trial court in giving it. The motion refers to this instruction as numbered 8, but manifestly it has reference to instruction numbered 7, for the reason that following the number of the instruction it is recited in the motion for new trial that the instruction "told the jury how they should construe what the defendant is alleged to have said against himself and how they might construe what he said at the same time in favor of himself." This recitation clear-

ly pointed to what was said to the jury in instruction numbered 7, and we shall treat the complaint as referring to that instruction. Instruction numbered 7 was as follows:

"You are instructed that if you find and believe from the evidence that the defendant made any statement or statements in relation to the homicide charged in the information as to how said homicide was committed, you must consider such statement or statements altogether. The defendant is entitled to the benefit of anything he said for himself, if true, and the State is entitled to the benefit of anything he said against himself in any statement or statements proven by the State. What the defendant said against himself, the law presumes to be true, because said against himself. What the defendant said for himself the jury are not bound to believe, because it was said in a statement or statements proven by the State, but the jury may believe or disbelieve it as it is shown to be true or false by the evidence in the case. It is for you to consider, under all the evidence or circumstances, how much of the whole statement or statements of the defendant proven by the State you, from the evidence, may deem worthy of belief."

In our opinion there is no substantial ground for complaint respecting instruction numbered 7. It has substantially, in the same form, met the approval of this court from its earliest history, commencing with the case of State v. Hays, 23 Mo. 287, down to the present time. In State v. Darrah, 152 Mo. l. c. 541, in discussing a complaint urged against an instruction in that case, in similar form to instruction numbered 7 in the case at bar, it was said that the instruction under discussion "has been approved so often in this State that we must decline to enter upon its defense." This court has in a number of cases expressly ruled that there was no error in declaring the law substantially as it is stated in instruction numbered 7, and we do

not deem it necessary to burden this opinion with the citation of numerous cases supporting the conclusions as herein reached.

## VII.

Finally the motion for a new trial assigns as a reason for the granting of a rehearing, that the verdict as returned by the jury is wholly unwarranted and manifestly rendered in utter disregard of the court's instructions and the evidence before the jury. Upon this proposition it will suffice to say that we have substantially indicated the nature and character of the testimony developed upon the trial of this cause, and in our opinion it cannot be seriously contended that there was not substantial evidence tending to show the guilt of the defendant of the offense of which he was convicted. In fact after a careful consideration of all the testimony developed upon the trial we see no escape from the conclusions that the jury could not, with any degree of reason for it, have returned any other verdict than the one returned in this cause. This is a very serious case and the results of it are quite important to the defendant. His counsel in the lower court presented his side of the case fairly and in a commendable lawyer-like way, and whatever may be the serious results confronting the defendant, at last they must be attributed to his own unlawful acts, which are so clearly disclosed by the record now before us. The defendant is not represented in this court, and we have, as heretofore indicated, fully considered the errors complained of in the motion for a new trial, and in the consideration of the complaints of such motion we have made an independent examination of the record with the view of ascertaining whether or not there was any substantial error by the court in the trial of this cause. With that end in view we have analyzed in detail the entire disclosures of the record and from this examination we see no escape from the

conclusion that the defendant was afforded a fair and impartial trial, and there is nothing left for this court to do except to give expression to its affirmance of the judgment. Entertaining the views as herein indicated, the judgment of the trial court should be affirmed, and it is so ordered.

All concur.