## THE STATE v. CLAUD BROOKS, Appellant.

### Division Two, May 18, 1909.

1. **CONFESSION: Inadmissible.** A confession to be inadmissible must be made to an officer of the law in consequence of improper influences exerted by him; and if no threats of harm or promises of worldly advantage be made by such officer, the confession is admissible.

2. ————: ————: **Under Arrest.** The fact that defendant was under arrest when he made the confession does not render it inadmissible; nor does mere adjuration to speak the truth, no threats or promises being made.

3. ————: ————: **Defendant's Testimony of Threats.** Where there is evidence on behalf of the State tending to show that no threats or promises were made to him, the fact that defendant testifies that there were such threats and promises does not render the confession inadmissible.

4. ————: **Improper Influences: Giving Defendant Whiskey.** Defendant, a negro, was arrested about 5:30 o'clock in the morning of January 14th, at his father's house about three and a half miles in the country, and on the way into town he complained of being cold and one of the officers gave him a small drink of whiskey, and after he arrived in town they gave him a good breakfast. Three or four hours later they boarded a train for the city, and on the train he made and signed his name to a short confession in the presence of the officers. When he left the train, seven or eight hours after his arrest, they gave him another drink of whiskey, and when they had taken him some distance to the police station he made a more lengthy statement to several officers and they and a farmer who stood by testified no inducements were held out to him, no threats or promises were made, and no intimidation used, and that he showed no signs of intoxication. *Held*, that there was no such improper influence as rendered the confession inadmissible as evidence, although the defendant testified that the first confession was extorted from him by fear that he would be swung from a bridge.

5. ————: ————: ————: **Instructions.** And where the court instructed the jury that if defendant was intoxicated by the whiskey given him, and that he was not in a condition to realize what he was doing and that the confession was obtained from him while he was in that condition, the jury should

reject the confession, he got the full benefit of his claim that the confession was not voluntary, and if the jury found against him there was no error in admitting the confession in evidence.

6. INSTRUCTIONS: Rejecting Defendant's. Where the instructions given by the court of its own motion fully cover those asked by defendant and defendant is thereby given the full benefit of those instructions, no error is committed in refusing defendant's.

Appeal from Jackson Criminal Court.—*Hon. Wm. H. Wallace,* Judge.

AFFIRMED.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

(1) The confession was properly admitted in evidence. In the case at bar there was evidence on the preliminary examination that no inducement was held out to obtain the confession from appellant, and in the absence of any improper conduct upon the part of the officers to induce such confession by flattery of hope or promise of immunity or use of threats, the confession was properly admitted in evidence. State v. Wooley, 115 S. W. 417; State v. Spaugh, 200 Mo. 596; State v. Hottman, 196 Mo. 127; State v. Barrington, 198 Mo. 110; State v. Ruck, 194 Mo. 438; State v. Patterson, 73 Mo. 695; State v. Jones, 171 Mo. 406; State v. Brennan, 164 Mo. 487; State v. Stebbins, 188 Mo. 387; State v. Kennedy, 177 Mo. 98; State v. Hopkirk, 84 Mo. 278. (2) If appellant desired an instruction on the theory of alibi he should have requested it or called the court's attention to its failure to instruct on that subject. State v. Graves, 194 Mo. 452.

GANTT, P. J.—The prosecution in this case was commenced by the filing of the information duly verified by the prosecuting attorney of Jackson county, wherein he charged the defendant with murder in the

first degree of one Sidney Herndon on the night of January 12, 1908, in Kansas City, Missouri.

As the information is in all respects sufficient, it is unnecessary to set it forth at length in this statement.

The defendant was arrested and duly arraigned and entered his plea of not guilty and the cause was set down for trial on the 17th day of February, 1908; on which date he was put upon his trial and convicted by the jury of murder in the first degree and his punishment assessed at death. In due time he filed his motions for a new trial and in arrest of judgment, which were heard and overruled, and thereupon the defendant was duly sentenced to be hung in accordance with the verdict of the jury. From that sentence he has appealed to this court.

The evidence tended to prove the following facts:

Sidney Herndon was a man forty-five years of age, about four feet in height, and had deformed feet and could only walk by the aid of crutches. He lived at what is known as the Navarre Flats, located at Twelfth street and Broadway avenue, Kansas City. He had an office and an adjoining bedroom on the second floor of said flats. There were some forty-four suites of rooms in the said flats, the building being a five-story one. The deceased was manager and collector of rents for the said flats, and owned an interest in the same; he had lived in Kansas City for a number of years, having moved there from Tyler, Texas. He was in the habit of reading until as late as midnight and would usually arise from nine to ten o'clock in the morning. The defendant is a negro man about twenty-one years of age, and had lived in Kansas City three or four years prior to the date of this homicide. He had worked at different times as elevator boy at said flats for the deceased, but had not been employed there for a month or more prior to the homicide. Deceased was last seen alive about 11:30

o'clock Sunday night, January 12, 1908, by the elevator boy, Vertner Jones, another negro. On Monday morning, January 13, 1908, about 11:30 o'clock, deceased was found in his office room, which fronts on Twelfth street, lying on the floor dead, having been struck on the head with an ordinary hammer some four or five times, and his skull fractured at least three times. The body of the deceased was in a pool of blood, one crutch hanging up and one lying on the floor at a distance of some six feet from the body.

The light was still burning in his office-room, and a book and a file case were lying on the table. The elevator stopped running at 12 o'clock as a usual rule, the elevator boy, Vertner Jones, and a brother of his, Emil Jones, and the fireman, Woodward, all leaving at the same time, about 12 o'clock that night. At about 11:30 o'clock Emil Jones, who was waiting for his brother to quit work, saw the defendant on the stairway near the second floor of said building and in an attitude of attempting to hide behind the railing. The defendant was noticed to have a piece of paper some five or six inches in length, rolled up as though something was contained in it. Emil asked the defendant what he was doing and defendant replied: "Keep still, do not say anything." The elevator boy, Vertner Jones, was the last one to see the deceased alive, and this was about 11:30 o'clock that night, when the witness went into the room of the deceased and turned down the lights and closed the door and left the deceased reading a book and sitting by the table in his shirtsleeves.

The testimony also tended to show that the defendant was living with a negro woman in a rented room at 1311 Wyandotte street, Kansas City, some two weeks or more prior to the date of this homicide, and that just a few days before the homicide the woman packed her trunk and left for Memphis, Tennessee, but defendant retained the room as his time did not

expire there until Monday, January 13th. This room he rented from a negro by the name of Webb, who testified that he had seen the same hammer with which deceased was killed, and which was found in the room with the body of the deceased, prior to that time in the room occupied by the defendant. That on Sunday night at 8:30 o'clock, the defendant came to where Webb was living and said he had lost a key that Webb had given him and asked him for his key and Webb loaned him the key, and defendant went into the room and was in there about ten minutes. The defendant was seen by the elevator boy to pass the Navarre Flats that Sunday night near 11 o'clock going north on Baltimore avenue. A piece of paper was found in the room where the body of the deceased was, which corresponded in color to that torn from a shoe box found in the room occupied by the defendant. The evidence showed that the defendant had a small stove in his room and that fresh ashes were in the stove on the morning following the death of the deceased; that the bottom of a drawer in a dresser or washstand had been knocked out and burned in the stove, and the defendant afterwards admitted that he burnt the leather pocketbook which he had taken from the deceased, in this stove.

It was further developed in the testimony that on the Monday morning after the homicide, between eight and nine o'clock, the defendant bought him a suit of clothes, an overcoat, a hat and a pair of shoes and some other wearing apparel, from a merchant by the name of Samuel Ginsberg, at 506 Walnut street, for which the defendant paid $27 or $28. At the time he paid for these goods, Ginsberg noticed that the defendant had several ten and twenty-dollar bills. The defendant's brother testified that on this same Monday morning, he met the defendant on Thirteenth street and the defendant gave him $15, telling him to keep ten dollars and give five to his wife.

Defendant left Kansas City Monday night at about 11 o'clock for his late home at Carrollton, Missouri. After the murder became known, two detectives and an inspector went to Carrollton, and early Wednesday morning in company with the sheriff and two deputies of Carroll county, drove out into the country some three and a half miles to the home of the father of the defendant, reaching there about 5:30 in the morning. The officers inquired of the defendant's father whether the defendant was there and the father replied that the boys were down town,. but the officers searched the house and found the defendant and a brother of his, sleeping in a back room with both doors locked. The defendant stated to the officers that he came from Kansas City four days before this time, whereupon one of the officers said to him that he had come down the day before, and he said he guessed that was right. Defendant was then arrested by the officers and taken to Carrollton, where he was placed in charge of the jailer, and a good breakfast was provided for him before starting on his return for Kansas City. On the way into Carrollton from his father's house, defendant complained of being cold, and one of the officers gave him a drink of whisky. At Carrollton the officers waited some three or four hours for the Santa Fe train and then started on their return to Kansas City. Soon after leaving Carrollton, the defendant made a full confession to Officer Halvey, detailing how he got into the building and into the room of the deceased and how he had killed the deceased with the hammer. He said that he went into the room of the deceased and asked for work; that he waited until after the elevator had quit running before entering the room; that he struck the deceased on the head with the hammer a number of blows and then robbed him of $150, which he found in his pants. He admitted seeing Emil Jones when he was on the stairway. After having made this confession to Of-

ficer Halvey, he repeated the same in the presence of Inspector Ryan and Officer Raptery. Officer Halvey then in their presence wrote down the statement as the defendant made it as follows:

"On Santa Fe train. My name is Claud Brooks, I am twenty-three years old. On the night of January 12th, I hit Sidney Herndon with a hammer and took $150 out of his pocket." After making this statement the officer asked him if this was correct and he said "yes" and then signed the statement. After he had made this statement the defendant said he felt better; he said he had been nervous ever since he had been down home, but he felt better now since it was all over with. After the prisoner reached the police office, the officers positively testified that they offered him no inducements to make the confession, nor made any threats to induce him to make it. They testified furthermore that they only gave him two drinks, one on the way from his father's home to Carrollton, which was a very small one, and one just before they got off the train at Sheffield. After reaching the police headquarters, the defendant made another confession in the presence of Mr. Hogan, the assistant prosecuting attorney.

The court permitted the defendant to have a preliminary examination of the officers in regard to the confession of the defendant, out of the presence of the jury, before the same was admitted in evidence. At the trial the defendant testified in his own behalf and denied the confession had been given voluntarily, but said it was extorted from him by fear of being swung from a bridge. The court permitted the defendant's counsel to examine the witnesses in full in the presence of the jury as to the means by which the confession was obtained. The defendant testified that he was intoxicated and the alleged confession was obtained from him through threats that he would be

hung from one of the bridges spanning the river in Kansas City, if he did not confess.

The defendant corroborated Ginsberg as to the purchase of the suit of clothes from him on Monday after the homicide on Sunday night.

In a statement or confession the defendant stated that he had worked for the deceased but had quit working for him because his brother wanted him to help him; that the deceased had always been friendly to him and they had gotten along together nicely. That on Sunday night, January 12, 1908, he went up to Mr. Herndon's room and knocked on the door; "he came to the door and I asked him for a job of work and he said he would see about it, then I hit him with the hammer, we did not have any words or any trouble and I hit him before he had time to defend himself. When he fell down I went through his pockets, got a pocketbook out of one of his front pockets, the pocketbook had $150 in it. I burned up the pocketbook at home where I lived. I put the money in my pocket and spent some of it and lost some of it playing poker with a white man on Sixth and Grand. I do not know where all the money went. I bought some clothes and other things and gave my brother ten dollars and his wife five dollars and my other brother five dollars. I never told them where I got this money. I knew Mr. Herndon carried a lot of money around with him, he always had his pockets full of silver and I seen him have his pocketbook with a lot of money in it, I expected to get about twenty-five or thirty dollars. About two or three weeks ago I got out of work and was short of money, I tried to get work but could not, so about two or three days before Sunday I decided to go up and rob Mr. Herndon. Two months ago I found a hammer at the place I roomed at, and I had kept it since, so I thought

I would take the hammer up and knock Mr. Herndon in the head with it and rob him and I thought that it that way I would get enough money to live on for a while, so I waited until Sunday night, January 12th, when I went up to Mr. Herndon's room and knocked him in the head as I told you before. When I got in I met a little colored boy named Emil Jones, he is a brother to the fellow who runs the elevator. I was sitting on the steps waiting until the elevator man quit work, this was about 12 o'clock Sunday night, and he was supposed to quit work at 12 o'clock. When Emil came back he saw me and said, 'Why, that is old Slick,' I said something to him but I do not remember what it was. After this Emil went away and in a little while Emil's brother quit work and they went home, then I went upstairs after they had gone. I did not see anybody else in the building. I went to Mr. Herndon's room and asked him for a job and knocked him in the head with this hammer. The hammer Mr. Hogan showed me is the hammer with which I hit Mr. Herndon. It is my hammer. I found it and kept it in my room. I carried this hammer from my room to the Navarre building that night wrapped up in a piece of paper. I carried it in my hand when I crawled into the window and held it in my hand when I met Emil Jones on the steps. I had a paper wrapped around the hammer when I hit Mr. Herndon with it. This statement is the truth and I make it of my own free will.''

Mr. James B. Colton testified that he lived in Jackson county and was a farmer; that he was present at the time the defendant made his confession to Mr. Hogan at the police station and the confession was written down in his presence. He testified that the facts stated in the confession were stated in his presence by the defendant; that there were no threats made to induce the defendant to make these state-

ments, nor any promises held out to him; that the defendant was sober as far as he was able to judge.

The defendant is not represented in this court by counsel and we have been compelled to examine this record in view of the various grounds assigned for a new trial.

I. The defendant objected to the evidence tending to prove his confession of the crime with which he was charged.

As already said, before his confessions or admissions of guilt were permitted to go to the jury, the court granted the defendant's counsel the right of a preliminary examination to ascertain whether the said confessions were obtained by means of promises of leniency held out to him or by threats to induce him to make the same. A careful reading of the testimony offered on this preliminary hearing clearly establishes that there were no inducements, either favorable or threatening, held out to the defendant to obtain this confession from him.

In State v. Patterson, 73 Mo. l. c. 705, it was ruled that it is the duty of the court to determine as a preliminary question whether a confession was made with that degree of freedom which ought to occasion its admission as evidence, and the criminal court followed this course in respect to this confession. The law is now settled in this State that a confession to be inadmissible must be made to an officer of the law in consequence of improper influences exerted by him and if no threats of harm or promises of worldly advantage be made by such officer or by the master of the accused when directly concerned, the confession is admissible. The fact that the defendant was under arrest did not render the confession inadmissible, and it has been often ruled that a mere adjuration to speak the truth does not vitiate the confession, no threats or promises being employed. And it has also been ruled that

where the evidence on behalf of the State tended to show that there was no such promise or threat made, the fact that the defendant afterwards testified that there were such promises, will not render the confession inadmissible.    There can be no doubt that the confession in this case was properly admitted in evidence.    [State v. Jones, 171 Mo. 1. c. 406; State v. Brennan, 164 Mo. 487; State v. Spaugh, 200 Mo. 1. c. 596, 597.]

II.    Moreover, in this case, in instruction number 11 given by the court, the court expressly told the jury that if they found from the evidence that the confession made by the defendant to the officers and other persons having the defendant in custody were made by inducements held out to the defendant in hope of escaping punishment or any other inducement amounting to threats, fears or promises, and that from such inducements the defendant made his several confessions they should disregard them.    And in instruction number 10 the court instructed the jury that if they believed from the evidence that the defendant, while in custody of the officers, was given intoxicating liquors and that thereby the defendant was not in a condition to realize what he was doing, and while in that condition a confession was obtained from him, then the jury should reject such confession.    So that the defendant had the full benefit of his claim that his confession was not voluntary.    But the jury found that the said confession was voluntarily made.

The fact that the defendant testified that he did not make the confession, or if he did it was made while he was intoxicated, or through fear, did not overcome the showing made by the State that his confession was voluntarily made.    It would be contrary to reason to exclude confessions voluntarily made at the time merely because the defendant should afterwards

conclude to testify that they were obtained by duress or promise of immunity.

III.   As to the refusal of instructions number 1, 2, 3 and 4, requested by the defendant, it must suffice to say that each of these instructions was fully covered and the defendant given the full benefit thereof, in the instructions given by the court of its own motion.

IV.   The complaint that the court did not instruct upon the question of alibi is answered by the fact that in its 8th instruction the court expressly directed the jury that if the evidence raised a reasonable doubt in their minds as to the presence of the defendant at the time and place where the crime was charged to have been committed, they would acquit him.

V.   The objections to the instructions given on behalf of the State were properly overruled.   There is no occasion for their reproduction in this opinion for the reason that they are such as have been often approved by this court.

The evidence in this case establishes a cold-blooded, deliberate murder, for the purpose of robbery, without the slightest provocation, and the evidence all points to the defendant as the perpetrator of the crime.

The defendant was given a fair and impartial trial.

The judgment of the criminal court must be and is affirmed, and is ordered to be carried into execution as therein directed.

*Burgess* and *Fox, JJ.,* concur.