STATE OF MISSOURI, Respondent, v. LEON ALEXANDER KLINK, Appellant, No. 43099—254 S. W. (2d) 650.

Court en Banc, February 9, 1953.

*Morris A. Shenker* for appellant.

*J. E. Taylor,* Attorney General, and *Hugh P. Williamson,* Assistant Attorney General, for respondent.

910

WESTHUES, C.—The defendant, Leon Alexander Klink, was tried and convicted in the Circuit Court of the City of St. Louis, Missouri, of molesting a minor as defined by Section 563.160, RSMo 1949. A jury assessed defendant's punishment at ten months' imprisonment in the City Workhouse and a fine of $500. Defendant [652] appealed. This court has jurisdiction because a violation of Section 563.160, supra, constitutes a felony.

The evidence on the part of the State disclosed the following: The child involved was Vivian Marie Mizell who was a niece of the defendant. She was nine years old and attended the Rose Fanning School in the City of St. Louis. At noon of December 1, 1949, the defendant drove his car to a store across the street from the school where he found Vivian and asked her to take a ride in his car. The two drove to Tower Grove Park and the defendant stopped the car near a pool while in the park. He then drove to St. Peter and Paul Cemetery and parked there for a short time. Defendant then drove back to the school where he arrived about ten minutes before one o'clock and let Vivian out of the car to return to school. The de-

fendant testified that he often took lunch to Vivian at noon on school days because Vivian when visiting at the defendant's home had stated she was not getting enough to eat at the lunch hour at school. Vivian's parents did not know of this until the defendant, a few days after December 1, called the Mizells and told them about it. Note the defendant's evidence:

"A. Well, when I picked up Vivian, the people at the time, that child molestation was going on, they thought that I was molesting Vivian. So I called up Mr. and Mrs. Mizell and asked them to come over to my house, and I explained to them that I was bringing their lunch to them and taking lunch to them during lunch hour, that was my purpose of going down there. And that is how they found out anything about it. I called them up.

"THE COURT: (Q) That is the reason you sent for them?

"A. I sent for them.

"THE COURT: (Q) Because of this rumor that you heard about—

"A. That's right.

"THE COURT: All right. That is the answer, Mr Shenker.

"MR. SHENKER: Thank you.

"THE COURT: That is the answer, Mr. Settich.

"MR. SETTICH: Thank you.

"Q. Did you ever tell Mr. Mizell and Mrs. Mizell that you were picking up Vivian at school and bringing her lunch, and, further, that you were taking her for a ride on her lunch hour?

"A. I told them at that time.

"Q. At which time?

"A. When we called them up, and I told them that we would bring—giving their lunch, taking their lunch down to them, I told them.

"Q. And that was about three, four or five days before you were arrested; is that right?

"A. Yes, I say it was somewhere, probably a little longer, about that time.

"Q. And is that the first time that you told Mr. and Mrs. Mizell that you were picking their daughter up?

"A. That is the first time I told them, yes."

The defendant admitted that he drove to the park and to the cemetery with Vivian. He admitted that he kissed the child a number of times but stated that she was his niece and she had often visited in his home and they always kissed each other on such occasions. In other words defendant's position was that there was nothing improper or unusual in such conduct.

Vivian testified the defendant kissed her and she gave the following testimony with reference to defendant's conduct:

"THE COURT: Wait a minute. You want to tell us? If you want to tell us, Vivian, why, you may, and if you don't want to, just say so. Would you like to tell what happened?

"THE WITNESS: Not all of it.

"THE COURT: Well, you just tell us just as much as you want, no more. All right; proceed.

"Q. (Mr. Settich) You say he kissed you; is that correct?

"A. Yes.

"Q. Did he do anything else?

"A. Opened his pants.

"Q. You say he opened his pants. What did he do after he opened his pants?

"A. I don't want to answer that.

"Q. Why don't you want to answer that?

"THE COURT: That isn't necessary. If she doesn't want to answer, she doesn't have to.

"MR. SWANSTON: That's right, your Honor, if she doesn't want to.

"MR. SETTICH: If your Honor please, as I said before, I believe that privilege is purely a personal privilege and cannot be interposed by counsel.

"THE COURT: Now, proceed. There is no compulsion on this little girl to answer any question she doesn't want to.

"MR. SETTICH: I think there should be some basis for refusal.

"THE COURT: Objection sustained. She will not be required to answer the question. Proceed. Go back to counsel table.

"Q. (Mr. Settich) How many times did he kiss you?

"A. I am not sure.

"Q. When he unbuttoned his pants, were you able to see anything?

"A. No. I told him that wasn't nice.

"Q. You told him that wasn't nice; is that correct? What did he do then while you were still in the park?

"A. He took my hand and tried to make me do it, and I tried to keep on pulling away."

\* \* \* \* \* \* \*

"Q. Did you leave the park?

"A. Yes.

"Q. And where did you go then?

"A. Cemetery.

"Q. Beg pardon?

"A. Cemetery."

\* \* \* \* \* \* \*

"Q. (Mr. Settich) What happened in the cemetery then?

"A. He kissed me.

"Q. And where did he kiss you?

"A. The same place he did in the park.

"Q. And that was on the cheek. What else did he do?

"A. He tried to pull down my pants.

"Q. Just how did he do that?

"A. He raised under my dress.

"Q. And what did he do after he raised under your dress?

"MR. SWANSTON: Just a minute. I'll object to that, your Honor, for the same reason.

"THE COURT: Well, objection overruled. If she wishes to answer; if she doesn't—

"THE WITNESS: I don't.

"THE COURT: You don't want to?

"THE WITNESS: No.

"THE COURT: Well, not required to answer.

"MR. SETTICH: The State will again interpose the same objection on the ground it is a personal privilege.

"THE COURT: Overruled.

"Q. (Mr. Settich) Did he do anything with your pants?

"A. No; he tried to pull them down.

"Q. And how many times?

"A. Once."

The defendant denied that he opened his trousers. He testified that he did loosen his belt and perhaps the upper button of his trousers because he had ulcers of the stomach and was uncomfortable. He denied the other accusation as related by Vivian. Defendant in addition to denying the charges, introduced evidence tending to prove that the Mizells, a few days before the defendant's arrest, demanded $10,000 of his wife (Mrs. Klink) and threatened to prosecute defendant if the $10,000 was not paid.

We may state here that Mr. Swanston who interposed objections on behalf of Vivian stated to the court that he was employed by Vivian's father and was there to protect Vivian's rights. The court thereupon appointed Mr. Swanston as amicus curiae. The appointment of Swanston as amicus curiae and the ruling of the court that the witness need answer only such questions as she wished constituted error. Up to this point in the examination, the ruling was error against the State. Naturally counsel for the defendant did not object.

When counsel for defendant proceeded to cross-examine the witness, he was [654] faced with the above ruling. We note that in the first point briefed the defendant complains that the trial court unduly restricted the cross-examination of Vivian. The trial court did restrict the cross-examination of this witness as to the separation of the witness' father and mother; as to a divorce suit having been filed at one time; and as to the fact that the mother, or rather stepmother, did not want to care for the children. The

court did not restrict the cross-examination as to the alleged demand for $10,000. Note the court's ruling:

"THE COURT: Well I'll sustain the objection to everything up to the point where you said that someone, the parent, the mother or the father of this girl,—

"MR. SHENKER: The father of the girl.

"THE COURT: —asked Mr. Klink for $10,000, and said if they didn't, if he didn't give it to them would cause him a lot of trouble, from that point on I'll permit you to show that."

Later during the trial, after a number of other witnesses had testified for the State but before the State closed its case, the trial court changed its ruling as to restricting the cross-examination of Vivian. Note the following taken from the record:

"(Court in recess for the noonday luncheon period)

"(After the court reconvened, the following proceedings were had out of the hearing of the jury:)

"THE COURT: Do you mind if I let the record show that I gave you an opportunity?

"MR. SHENKER: I can't do anything about it.

"THE COURT: Then let the record show that before the State had closed its case the Court announced to counsel for the defendant that he might recall the witness Vivian Mizell for further cross-examination, and that his cross-examination would not be curtailed as to matters material and relevant in the opinion of the Court.

"MR. SHENKER: And that I declined to accept that offer at this time."

The record discloses that the defendant's counsel did not attempt at any time to cross-examine Vivian as to what occurred at the park or at the cemetery. He did cross-examine Vivian at some length as to frequent visits by her and her sisters to the defendant's home; also as to the fact the children stayed at defendant's home for periods of a week or so when the stepmother was at a hospital. This cross-examination occurred before the court made the offer which the defendant's counsel declined. The record, therefore, shows that the only restriction placed on the cross-examination was with reference to the difficulty between Vivian's parents. We must rule that the trial court did not err in thus restricting the cross-examination. The extent of cross-examination rests largely within the discretion of the trial court. State v. Ryland, 324 Mo. 714, 25 S.W. (2d) 109, l.c. 111 (3, 4). Furthermore, Vivian's father was a witness. He admitted there had been a separation for about five or six weeks beginning in August, 1949. Witnesses for the defendant testified fully concerning the marital troubles of Vivian's parents. There was also an abundance of evidence with reference to the alleged demand for $10,000. Vivian's father admitted that he spoke to Mrs. Klink, his sister, about $10,000 but stated that he wanted to

borrow that amount to purchase a home. Later a home was purchased but no money was obtained from the Klinks. All of this evidence was material for one purpose only, that is, for the jury's consideration of such evidence as affecting the credibility of the witnesses. We must rule the point against the defendant.

The defendant's second point briefed reads as follows: "The Court erred in permitting the Assistant Circuit Attorney to attempt to impeach one of the State's own witnesses and in failing to declare a mistrial when said attorney stated that the phraseology of the defense counsel's question had the witness confused." We see no merit in this contention. The record justifies a conclusion that the witness was confused. Mr. Shenker, attorney for the defendant, asked Vivian the following question:

"Q. Your mother first told you, is that right, that Mr. Klink had something to do with you?

"A. Yes."

The prosecutor thereupon asked Vivian if she understood the last question. The attorney for the defendant objected on the ground that the State was impeaching its own witness. After some colloquy between the court and the attorneys, the State's attorney said, "I think the phraseology of the last question of Mr. Shenker had this witness confused." Mr. Shenker then asked the court to instruct the jury to disregard the statement. The court did so. The defendant's attorney asked for a mistrial which request the court refused.

The defendant, as above-noted, testified Vivian's parents did not know that he had been taking lunches to Vivian or that he had taken her to the park and cemetery until he, the defendant, informed them of these matters a few days before his arrest. Further questioning by the court revealed the following:

"THE COURT: (Interrupting) Now, Vivian, just tell us if you understand that question, to me.

"THE WITNESS: It means that my mother found out that I had something to do with Leon.

"THE COURT: Well, the question was, did your mother first tell you that?

"THE WITNESS: Yes.

"THE COURT: You said 'yes'.

"THE WITNESS: She asked me to tell her, and then I told her, and she said 'Uh huh'."

The evidence justified the conclusion that Vivian meant to say by her answer that her mother was the first person to discuss the subject of the defendant's conduct with the witness. Certainly the trial court did not abuse its discretion in refusing to declare a mistrial. 23 C. J. S. 600, Sec. 1116; State v. Whipkey, 361 Mo. 1008, 238 S.W. (2d) 374, l.c. 378 (11-13).

■ Defendant in his third assignment of error says the State's principal instruction authorizing a conviction was erroneous in that it failed to require a finding that the acts charged were done willfully, unlawfully, and feloniously. The statute, Section 563.160, does not require the acts to be done willfully, unlawfully, and feloniously. In so far as the present case is concerned, the statute says that any person who shall take indecent or improper liberties with a minor shall be guilty of violating the section. The defendant also says that the instruction authorized a conviction if the jury found that the defendant in the presence of Vivian unbuttoned his trousers. We do not so read the instruction. Note the language as to what was required in the instruction which reads substantially as follows: The court instructs the jury that if you find and believe from the evidence, beyond a reasonable doubt and to a moral certainty that the defendant in the presence of Vivian unbuttoned his pants and, in doing so, the defendant took indecent or improper liberties with Vivian, then you should find the defendant guilty of annoying or molesting a minor.

It was a question for a jury. If the jury believed the defendant, that he loosened his belt and unbuttoned the upper button of his trousers for the purpose of alleviating discomfort due to ulcers of the stomach, then such acts were not indecent or improper. If, however, the defendant unbuttoned his trousers in the manner and in the circumstances as testified to by Vivian, then a jury was justified in finding that the defendant took indecent or improper liberties with Vivian.

The record contains circumstantial evidence supporting the State. The defendant contended that his actions were entirely altruistic; that he was taking lunches to Vivian because he had been informed she was not getting enough to eat. Vivian had two sisters, one older and one younger than she, who attended school but the defendant did not display enough interest in them to find out where they went to school. Again a jury was justified in finding that a man of defendant's age with a wife and grown children would not take a small girl, even his niece, to a public park during the noon school recess, park his car and indulge in kissing the child. One more circumstance, why did the defendant take [656] Vivian to the cemetery which is a place certainly not frequented by many people during the noon hour? Defendant admitted all this and that he parked in the cemetery and there, as in the park, kissed Vivian. We hold the evidence ample and the instruction not vulnerable to defendant's complaint.

■ Defendant says that the trial court erred in failing to instruct the jury on common assault. Suffice to say, the defendant was either guilty under Section 563.160, supra, or not guilty of any offense. This is a special statute enacted for the protection of

minors. The legislature has deemed it necessary that persons taking indecent or improper liberties with a minor shall be guilty of annoying or molesting such minor and subject to punishment for a felony. Defendant referred to Section 563.150, RSMo 1949, which is a general statute prohibiting adultery and gross lewdness and a violation is declared to be a misdemeanor. As we said above, the section under which defendant was prosecuted is a special statute protecting minors and if defendant was guilty of gross lewd conduct with Vivian, then, of course, he was guilty of a felony. Section 563.160, supra, is for the protection of the public in general. People v. Camp, 183 P. 845 (Cal.).

In assignment five, the defendant complains of a statement made during argument of the State's attorney with reference to Vivian's evidence. Defendant says the attorney misstated the evidence. The statement made was as follows:

"You remember the question that was asked; the one, last, final question of Vivian Marie Mizell was, 'Now, you are telling us what your mother told you?' And did you remember when the Court took over, the Court examined the little girl, she says, 'By that I meant I told my mother what had happened'. That was her testimony."

The record discloses as above-noted that Vivian testified "She" meaning her mother, "asked me to tell her, and then I told her, and she said 'Uh huh'." We see no material misquotation of Vivian's evidence in the statement and rule the point against the defendant.

In the last point briefed the defendant says Section 563.160, supra, is unconstitutional because it violates Article I, Section 18(a) of the 1945 Missouri Constitution in that defendant has the right "to demand the nature and cause of the accusation." It is argued that the section contains generalities and is not sufficiently clear and precise as to inform a person of the nature of the acts prohibited. Defendant filed a motion to quash the information but did not present therein any constitutional question. To preserve a constitutional question, it must be presented at the first opportunity. In the motion for new trial defendant did not refer to any provision of the constitution. The point is not preserved for review.

Finding no reversible error, we hereby affirm the judgment.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the Court en Banc.

*Ellison, Hyde, Hollingsworth, Dalton* and *Leedy, JJ.,* concur; *Tipton, J., and Conkling, C. J.,* dissent and adopt the memorandum prepared by *Barrett, C.,* as their dissenting opinion.

### MEMORANDUM OF DISSENT

BARRETT, C.—An improperly conducted criminal proceeding is a grave and serious matter, as much cause for concern and

918

pause as child molestation. Fortunately, the unfair or improperly conducted criminal trial is preventable. This absolutely unique record is a flagrant infraction of first principles in the orderly administration of justice, and for that reason I respectfully urge the view that the ends of justice will be better served by the granting of a new trial. It is immaterial that the impropriety inadvertently resulted, or that it was prompted [657] by the loftiest of motives on the part of the trial judge.

The state's principal witness, Vivian, is a child of nine. The defendant is her uncle, a man fifty-three years of age. The mere charge that he sexually molested the child is sufficiently inflammatory to demand the exercise of the greatest caution and restraint to the end of insuring, as far as possible, detached consideration on the part of the jury. What we may think of the defendant's guilt is also immaterial, and it is likewise immaterial that some of the impropriety, as some may think (which I do not), may have apparently inured to the defendant's benefit.

The child was the first and obviously the most important witness called. The essence of the offense and the defendant's guilt were indeed dependent upon her testimony. She was asked her name and address. When asked her address she began crying. The assistant prosecuting attorney asked her father's name. She answered and at this juncture a lawyer, like the ghost of a play, literally walked into the case. The record recites, "Mr. J. E. (Coming forward)," objecting. He had not theretofore entered his appearance in the trial. It does not appear that he was present during either the voir dire examination or the opening statements. This much is certain, he did not represent the state and he does not represent the defendant. When asked whom he represented, he falteringly said, "Appearing for the—representing the father of this little girl." The transscript then recites that there was an "off-the-record discussion." All the rest of the colloquy and proceedings transpired in the presence of the jury. The next entry in the transcript is this: "The Court: Well, you say you represent the family?" Lawyer, "Yes, I do, your Honor." Thereupon the court, without request or solicitation by anyone, made the unauthorized and unprecedented announcement—"The Court will recognize you as amicus curiae. The family, I don't think, is entitled to appear by counsel in the case, but the Court may appoint an amicus curiae, and I'll appoint you, and you make a memorandum to that effect and file it with the clerk so your status will be determined." The amazing response by the lawyer was, "I act as amicus curiae. At this time I have instructed this young lady that she has the right to stand on her constitutional rights and refuse to testify further on the ground of self-incrimination." The court remarked that she had not been asked anything except the name of her father. The lawyer replied,

"Well, I don't want her to go too far, your Honor." Immediately, and again without request, the court announced the unusual and shocking conclusion that the child could testify to or tell whatever she wanted to, and whatever she did not want to tell she did not have to. The court then inquired of the child whether or not she wanted to testify and after the lawyer told the court that she was "too young to understand the ground of self-incrimination" the court concludes, "She says she wants to. If she wants to, that can be waived. (Addressing the witness) Do you want to tell us or would you rather not? Just tell me, would you rather not tell anything about what happened or do you want to tell? The Witness: I don't know what all happened. I am not positive." Sobbingly, however, the witness decided that she desired to testify, and the examination of the prosecuting attorney continued, as to preliminary matters, through four pages of the record.

Thereafter, over the exception of the prosecuting attorney to the lawyer's objections, the lawyer who had been employed by the child's father or mother (for what purpose does not plainly appear), in the following thirteen pages of the child's interrogation on direct examination, interposed and made nine more objections to the child's testifying or answering specific questions. Without exception not a single objection was well taken, and if the objections themselves were not inflammatory they were certainly not calculated to induce impartial detachment and consideration on the part of the jury. For example, she was asked where she had seen her uncle. She replied, standing by a door at a store. She was then asked, "Did he say or do anything to you at that time?" The lawyer, "This is where I come in. This young [658] lady—I advise this young lady to refuse to testify further on the ground of self-incrimination." Again the interjection was "Just a minute, your Honor. My objection, your Honor." Or, "Just a minute. I'll object to that, your Honor, for the same reason."

Invariably the court sustained the objections or instructed the witness, not for the reasons given by the lawyer but because of the previous ruling that the child could tell what she wanted to and would not be compelled or coerced to tell what she did not want to tell. For example, the court said, "Wait a minute. You want to tell us? If you want to tell us, Vivian, why, you may, and if you don't want to, just say so. Would you like to tell us what happened?" Later the court said, "Now proceed. There is no compulsion on this little girl to answer any question she doesn't want to." Or again, when the lawyer objected, "(Addressing the witness) You remember, just tell us what you want to tell us. If you don't want to tell us, just say you don't want to say anything about it." Typical of the court's attitude is this observation, "I am not going to compel her to answer any questions or make any statements unless she does so voluntarily.

Anything she doesn't want to tell, the Court will not use any compulsion to make her tell it.''

It will be observed, up to this point in the trial, that there were no objections by defendant's counsel. Thus far the restrictions were upon the prosecuting attorney and he made the objections. The court's ruling, however, was carried over into the cross-examination. She was asked whether she had not stayed with her uncle while her father and mother were separated. When the court sustained a general objection to the question defense counsel inquired whether the objection was sustained on the ground that she did not care to answer, and the court said, ''Yes, doesn't care to answer. Mr. Shenker: All right. The Court: The same rule has to go both ways.'' Upon further inquiry and colloquy along this line Vivian again cried, and the court said, ''(Addressing the witness) Don't cry. She doesn't want to answer that. She doesn't want to answer that, she says. Mr. Shenker: All right.'' Defense counsel then undertook to interrogate her as to whether her mother had sued the father for divorce. Upon objection that it was immaterial, the court said, ''It is not sustained on that ground. It is sustained on the ground that she has indicated she doesn't want to answer questions of that character. * * * The Court declines to use any compulsion. If she doesn't want to answer, the only thing, I can declare her in contempt and commit her to jail, and I won't do that. Mr. Shenker: I won't ask the Court to do that. *The Court: All right. The objection is sustained. I won't require her to answer anything she doesn't want to.* Mr. Shenker: *In order that the record may be clear, I want to ask the question, and that is her attitude, and that is the Court's ruling, and all I can do is save my exception to the Court's ruling; nothing else to do about it.*''

It is not required of defense counsel that he make specific objection to the improper remarks, opinions, comments or rulings of the trial judge. All that is required is that he *except* to the court's statement or ruling, thereby indicating that he does not willingly abide by the court's views. In State v. Hill, 91 Mo. 423, 4 S. W. 121, the effect of the court's remarks was to coerce a verdict before a certain time. At the conclusion of the court's remarks the opinion recites, ''To which verbal charge to the jury the defendant excepted.'' The court said that the effect of the court's remarks was to coerce a verdict and upon defense counsel's mere exception reversed and remanded the judgment of conviction. In State v. Nelson, 181 Mo. 340, 345, 80 S. W. 947, the same question was involved and upon counsel's mere ''We except to the remarks of the court'' the conviction was reversed. See also State v. Eatherly, 185 Mo. 178, 181, 83 S. W. 1081. In several cases in which improper evidence has been admitted and there were written instructions by the trial court to disregard it, this court has nevertheless remanded the causes for

new trials when the impropriety was obvious. State v. Kuehner, [659] 93 Mo. 193, 196, 6 S. W. 118; State v. Benson, 346 Mo. 497, 142 S. W. (2) 52; State v. Smith, 357 Mo. 467, 474, 209 S. W. (2) 138. "It has been frequently ruled by this court that an instruction to disregard evidence improperly admitted in a criminal case will not cure the error of admitting it, if it was of a character prejudicial to the defendant." State v. Martin, 229 Mo. 620, 640, 129 S. W. 881. The rule has been applied likewise to the improper argument of state's counsel. State v. Spivey, 191 Mo. 87, 112, 90 S. W. 81.

This court has often frowned upon the interposition of "special prosecutors" and their conduct. State v. Mumau, (Mo.) 181 S. W. 1143. "This custom of permitting the employment of special prosecutors and allowing them to conduct criminal cases for the State, while not unauthorized, is not to be commended; they are usually employed by private individuals solely to secure a conviction, and their zeal and energies are bent to accomplish that end; this is not the sole purpose of a criminal prosecution but a result which may, and if the accused is shown to be guilty, should follow a fair and impartial trial, always best afforded the accused when the prosecution is conducted by the State's accredited representative, who, no matter how vigorously he may prosecute, does not, or at least should not, under his oath, lose sight of the fact that the accused is entitled to a fair trial." State v. Moreaux, 254 Mo. 398, 409, 162 S. W. 158. But never before has this court been confronted with the interposition of a hired lawyer in a criminal prosecution whom the trial court appoints as amicus curiae for the prosecuting witness. It is of no consequence that the lawyer's objections may have inured in some degree to the defendant's benefit. Whether they did or not is pure supposition. As we have said, it does not appear just why he was employed. There was considerable cross-examination as to whether Vivian's mother or father or both of them had attempted to extract $10,000 from the defendant as the price of peace and freedom. A duly elected prosecuting attorney who is "interested" in a criminal case is disqualified from taking part in the criminal prosecution. 1949 Mo. R. S., Sec. 56.110; State v. Jones, 306 Mo. 437, 268 S. W. 83.

But these matters are all beside the mark, they are only offered for the purpose of demonstrating impropriety and that the defendant's exception was sufficient to preserve the impropriety for review. The matter was fully and completely called to the trial court's attention in the defendant's motion for a new trial in his specifications eighteen, twenty-two and twenty-three in which it was pointed out that the effect of the court's ruling was to directly and affirmatively limit his right to cross-examination. The important thing is that the hired lawyer's interposition in the trial, the court's treatment of him, and the court's rulings with respect to his objections were certainly not conducive to the orderly adminstration of justice and for that reason

this defendant is entitled to a new trial. "In reviewing this assignment, we are not unmindful that the able District Judge who tried this case has, heretofore, established a reputation for fairness and judicial poise, and in this opinion we do not wish to imply that the trial judge intentionally was unfair. But as the authorities herein referred to point out, the harm done is not diminished where the judge, by reason of unrestrained zeal, or through inadvertence, departs from 'that attitude of disinterestedness which is the foundation of a fair and impartial trial.'' Williams v. U. S., 93 F. (2) 685, 687.