STATE of Missouri, Respondent,

v.

Delmar MAYBERRY, Appellant.

No. 44087.

Supreme Court of Missouri.

Division No. 1.

Nov. 8, 1954.

Robert A. McIlrath, Flat River, for appellant.

John M. Dalton, Atty. Gen., John S. Phillips, Asst. Atty. Gen., for respondent.

DALTON, Presiding Judge.

Defendant killed Charles Talley in Frankclay, St. Francois County on the 23rd day of May, 1948, by stabbing him with a knife. He was charged with murder in the first degree and the cause went on change of venue to the Circuit Court of Bollinger County, where defendant was convicted of murder in the second degree and his punishment assessed at 25 years imprisonment in the state penitentiary. He has appealed, but has not favored us with a brief. It is, nevertheless, our duty to examine the record and, in doing so, we must look to the assignments in defendant's motion for a new trial for his assignments of error, and consider such of them as are sufficient under Sup.Ct. Rule 27.20, 42 V.A.M.S., Section 547.030 RSMo 1949, V.A.M.S., to preserve anything for appellate review. Sup. Ct. Rule 28.02, Section 547.270 RSMo 1949, V.A.M.S.; State v. McCormack, Mo.Sup., 263 S.W.2d 344, 345. The motion contains 23 assignments covering numerous matters, such as the admission of evidence, the rejection of evidence, the conduct of the trial, the giving of instructions and the alleged improper argument of counsel for the state. There is no contention that the evidence was not sufficient to sustain the conviction of murder in the second degree.

This is the second appeal by this defendant. A prior judgment of conviction of murder in the second degree and a sentence of 55 years imprisonment in the state penitentiary was reversed and the cause remanded for a new trial. State v. Mayberry, 360 Mo. 35, 226 S.W.2d 725. Reference is had to the statement of facts in the opinion in that case for the relationship of the parties, the surrounding facts and circumstances and a review of the evidence tending to support defendant's theory of defense. Substantially the same facts as reviewed in that opinion appear in this record and they will not be further reviewed. Only a brief additional statement of the state's evidence concerning the actual commission of the offense is required, together with a statement of certain other facts and circumstances.

The record indicates that defendant was jealous of Talley (the deceased) and was suspicious of the relations between him and defendant's wife. Defendant thought deceased "was messing around with her" and defendant was further suspicious of the reasons for her sudden trip to Frankclay only a few days before the occasion in question and of her failure to return to her home in St. Louis on Saturday evening before the difficulty on Sunday. The ground for these suspicions clearly appears from the testimony of defendant and his wife and certain corroborating evidence developed by the cross-examination of certain witnesses for the state.

The state's evidence tended to show that defendant came to the home of his stepdaughter, Pauline Gilliam, in Frankclay between 9 and 10 p. m., Sunday, May 23, 1948, after all members of the household had retired. He opened the front door, stepped in the living room, turned on the electric light and saw and spoke to his wife who was sleeping on a cot in the living room. He said: "I warned you, God damn you." The light in the living room aroused defendant's stepdaughter, who was sleeping with her husband in the adjacent bedroom to the west. There was a six foot archway between the two rooms. The stepdaughter saw defendant go immediately

to the kitchen to the north of the living room, where he turned on the kitchen light and then opened the drapes covering the doorway between the kitchen and the bedroom to the west in which Talley, Pauline's father and the former husband of defendant's wife, was sleeping. When defendant entered Talley's bedroom, he had an open knife in his hand. Talley was in bed, with his head to the west, lying on his left side, facing the north wall, with the bed covers over him. Without saying a word, defendant proceeded to the bed and stabbed him. Pauline testified: "He had a knife. * * * I seen him stab my daddy in the belly." Talley had turned over and started to raise up when the stabbing began. Talley died a few minutes later of various stab wounds over his body, particularly over the chest and abdomen. Defendant then went outside and awaited the arrival of members of the Highway Patrol. Deceased's body was found in the opening between the kitchen and living room.

When two patrolmen arrived in a patrol automobile, defendant approached and said: "Here I am and I am ready to go * * *. I killed him * * * this is the knife that I used to kill him with." Defendant then handed to the patrolmen a pocket knife which had blood on both blades. Defendant at their direction then took a seat in the patrol car. After defendant was seated in the front seat of the car he was talking to some men on the outside, and Sergeant A. G. White heard him "tell some of them that were standing beside the car that he had killed Talley and he stated he went inside the house and Talley was in bed and he stabbed Talley in the stomach before Talley could get the covers off of the bed, and after Talley got up he cut him several more times." While still seated in the patrol car, defendant told his story to Trooper H. H. Barr. He said, " 'I killed him in cold blood murder, I don't ask anything of anybody, and I am willing to take my punishment. * * * I came down here to kill the son-of-a-bitch if I caught them together * * *. I came down from St. Louis, and I came over here to Frankclay in a taxicab and went down to my daughter's house and

asked where my wife was, and they said over there', and he said he knew they meant over to Guy Gilliam's house. He said he went over to Guy Gilliam's home and opened the front door without knocking and switched on the light and saw Gretchen his wife sleeping on the bed there, and then he went on into the kitchen and switched on the kitchen light, and saw Charley Talley in the bedroom adjoining the kitchen. He said, 'I went in and stabbed him in the stomach', and he said, 'he got up and threw something at me, and I thought it was a vase, and I really went to work on him then * * *. I didn't think anymore about killing the son-of-a-bitch than I would a dog.' "

A blanket and a comfort, which a patrolman testified he found on the floor in the center of Talley's bedroom were in evidence and the testimony shows that there were a number of cuts and holes in the blanket, one in the middle of it, and there were several holes in the comfort, "one hole going clear through the comfort and it had blood on it" and there were also several cuts on the side of the comfort. Other facts will be stated in the course of the opinion.

█ Defendant's first assignment in his motion for a new trial is that the court erred in refusing to allow James Mayberry, defendant's brother, to testify in rebuttal that he made a statement, "why did you kill the dog and let the bitch go." Defendant offered to show that James Mayberry made such a statement to defendant and others at the time defendant was seated in the automobile after his arrest. There is no evidence tending to show that defendant had made any such statement to anyone. The evidence referred to, which was offered and excluded, was not in rebuttal of any of the state's evidence. It was immaterial, irrelevant and wholly incompetent for any purpose and was properly excluded. Defendant testified that he made no statements "at all" to Trooper Barr or Sergeant White and that he had not said in their presence that he had no more regret than if he had killed a dog.

Assignment No. 2 is that the court erred in allowing Guy Gilliam to testify that Talley "was paying board" as it was immaterial and was used to try to prove that the deceased had a right to be there. The evidence showed that Talley was married, and had separated from his second wife, but was not divorced. He was employed by the St. Joe Lead Company and had been living in his daughter's home for five weeks. Over defendant's objection that, "that wouldn't make one bit of difference", the court permitted a showing that Talley was paying board to his son-in-law in the sum of ten dollars per week. The evidence was competent as explaining deceased's presence in the home on a theory other than his relationship with defendant's wife. The objection did not indicate that the evidence objected to was prejudicial for any reason, but only that it was immaterial. Rulings on objections to the admission of evidence will not, on appeal, be held erroneous for reasons other than those given at the trial. State v. McCord, 237 Mo. 242, 245, 140 S.W. 885. The mere admission of immaterial evidence does not indicate prejudice, and none appears from the admission of this evidence. Only prejudicial error is reversible error. State v. Rohman, Mo.Sup., 261 S.W.2d 69, 72.

Assignment No. 3 is that the court erred in allowing the testimony of Sergeant White and Trooper Barr as to statements made by the defendant while he was under arrest and when he had not been notified of his constitutional rights. There was no objection to the testimony of Sergeant White concerning defendant's statements to some persons outside the automobile, that is, until after it had been given and several additional questions had been asked and answered, then a motion to strike for the reason stated was made and overruled. No timely objection had been made. The witness had previously testified before the court, in the absence of the jury, that the statements of the defendant were not in response to any questioning by either officer. Trooper Barr testified that, after defendant said, "here I am, I killed him", and defendant had handed him the knife and said "that's what I killed him with", witness told defendant to get in the car, and defendant walked around and got in on the right hand side of the patrol car, and then, without being asked any questions, the defendant proceeded to tell his story as hereinbefore set out. The court did not err in admitting the statements in evidence, since the record shows that the defendant freely and voluntarily made the statements. State v. Hoskins, 327 Mo. 313, 36 S.W.2d 909, 910; State v. Brooks, 220 Mo. 74, 119 S.W. 353; State v. Hinojosa, Mo.Sup., 242 S.W. 2d 1, 8. While defendant denied that he made the statements attributed to him, there was no evidence of duress, threats or promises. Defendant testified that he said "here is the knife I killed him with * * *. I am ready to go", and that he got in the car of his own free will and talked to his brother and father on the outside of the car, and that Trooper Barr "was around the car somewhere." The assignment is overruled.

Assignment No. 4 is that the court erred in allowing Sergeant White to testify from his notes. The objection was to the witness "using his notes to testify from", and "for the purpose of testifying." At the time there was no proof that the witness was using notes, unless it could be inferred from the use of the words, "let's see." Subsequently, while testifying before the court in the absence of the jury, the witness testified that he had referred to a report, his personal report which he had prepared the night of May 23, 1948, a copy of which had been sent to the Highway Patrol Department; that he had made the report himself and typed it himself; and that, in his testimony, he had referred to the report in his hand merely to refresh his memory. It was within the court's discretion to permit the witness, when testifying, to refer to the report, which he had personally prepared on the night of the occasion in question, and to refresh his recollection, particularly so, in view of the lapse of time from May 23, 1948 to June 15, 1953. State v. Patton, 255 Mo. 245, 255, 164 S.W. 223; State v. Palmberg, 199 Mo. 233, 253, 97 S. W. 566.

Assignments 5 and 7 are that the court erred in allowing State's Exhibits "F" and "G" (a blanket and comfort) to be shown to the jury for the reason that the condition of the blanket and comfort, prior to the time of the killing, was not shown. The record shows that Sergeant White found these exhibits in the middle of the floor in Talley's bedroom. There were marks on them and seven or eight cuts in the blanket and one hole through the comfort that had blood on it. Defendant's counsel objected to the questions about these holes and marks and objected to the introduction of the exhibits in evidence until such time as the state could show the condition of the exhibits prior to the time they were picked up "off the bed." A further objection used the words, "prior to the time Delmar Mayberry went in there." No question was raised concerning the identity of the blanket and comfort as being off of Talley's bed, nor as to their condition in any respect except as to the cuts or holes referred to by counsel. The court did not err in admitting the exhibits. Pauline Gilliam had previously testified that she took care of the housekeeping and made her father's bed every day and that there were no holes in the comfort or blanket prior to the night of the killing. Subsequently, on cross-examination, the witness confirmed her prior testimony as to the use of the comfort and blanket as covers on the bed in the northwest bedroom of her home and that there were no holes in either prior to the night in question. Assignment No. 13 also based upon the theory that there was no evidence as to the prior condition of the blanket is overruled.

Assignment No. 6 is that the court erred in permitting Sergeant White to testify concerning the condition of the blanket "for the reason that the exhibit was there and was the best evidence." The record shows the witness was asked, "What did you notice about the blanket?" Counsel objected on the ground that "the blanket speaks for itself." The objection was overruled and the witness answered "There are some marks on the blanket." There was no error, since the exhibit it-self would not necessarily advise the jury as to what the witness had noticed about its condition. The question asked was not objectionable on the ground assigned. There was no prejudicial error in any event as the blanket was subsequently introduced in evidence and was passed to the jury for examination. The witness was examined and cross-examined with reference to its condition. State v. Saussele, Mo.Sup., 265 S.W.2d 290, 296.

Assignment No. 8 is that the court erred in allowing the state to introduce in evidence State's Exhibit "H", referred to as the statement purported to have been taken from defendant at a time when he was under arrest and had not been completely informed of his rights, and when he had had no chance to consult an attorney. When the exhibit was offered and admitted in evidence, the objection was, "I object to that as heretofore stated." There was no prior objection to the exhibit, but prior oral statements by the defendant to the witness (the witness who identified the exhibit) had been objected to "unless they show they told him of his constitutional rights." Subsequently, but before the introduction of the exhibit, the witness testified: "I asked him if he wanted to make some statements, and if he didn't want to make them it was alright, and if he did want to make them he had a right to have a lawyer, if he wanted one, and I told him that what he told me could be used in the court against him. Q. And after you told him that did he still want to make a statement to you? A. Yes, sir." The statement was reduced to writing in defendant's presence and read over to him. He caused a correction to be made, so that it would read that his wife was "laying" in bed rather than "sleeping" when defendant entered the Gilliam home. He then signed the statement. In the absence of the jury, the court had previously heard testimony tending to show that the statement was a voluntary one. At that time defendant testified to no threats, or promises, or coercion, but said he had made no statement and could not read, except his name, and that he signed the paper they

gave him to sign. The opening paragraph of the statement reads: "* * * I make the following statement of my own free will, and have not been coerced, punished, or threatened in any way, nor have I been promised any leniency, and I know what I say may be used in a court of justice against me." The statement for the most part substantially conforms to what the testimony shows he had previously stated to by-standers after he entered the patrol car after Talley's death. The assignment is overruled.

Defendant's assignments 9, 10, 11 and 12 allege error in allowing assistant attorney general Roberts to ask defendant certain specific questions in cross-examination. Each question was objected to as being argumentative and improper. The objection was overruled and each question was answered and there is no contention that any improper evidence was elicited. Each question was directly based upon facts previously testified to by defendant and, assuming in effect the truth of the facts testified to, asked a further question. For example, defendant had testified that his wife had told him of the trouble Talley had been causing her and that he was threatening to come to St. Louis for her; that defendant saw Talley in bed before he went in Talley's bedroom and Talley had said to him, "Don't you come in here you son-of-a-bitch, I will kill you"; and defendant had further testified: "Well, before I went in where Talley was at, I opened my knife up in the kitchen and put it in my pocket * * *. I knew Talley was a high tempered man and I was not man enough to handle him with my fist if he caused me trouble * * *. I walked in and thought I would talk to Talley and see if he would stay away from me and my wife." Defendant was then asked and he answered such questions as, "Now Delmar, if you did not intend to go in there and cause trouble to Charley Talley, why did you open your knife?" and "Now if you knew he was a high tempered man and you were not man enough to handle him with your fists, why did you go into his bedroom at all?" Argumentative questions are improper.

State v. Carroll, Mo.Sup., 188 S.W.2d 22. However, the trial court has considerable discretionary latitude in controlling the cross-examination. State v. Klink, 363 Mo. 907, 254 S.W.2d 650, 654; State v. Rhoden, Mo.Sup., 243 S.W.2d 75, 79. Unless this discretion is clearly abused the appellate court will not interfere. State v. Whipkey, 358 Mo. 563, 215 S.W.2d 492. The trial court did not abuse its discretion in overruling the objections to the several questions complained of under these assignments. The questioning with reference to the matters inquired about was proper cross-examination of the defendant. State v. Davis, Mo.Sup., 267 S.W. 838, 840(4); State v. Bagby, 338 Mo. 951, 93 S.W.2d 241, 247(8); State v. Sherman, 264 Mo. 374, 175 S.W. 73, 74(5–6); State v. Tyson, 363 Mo. 1242, 258 S.W.2d 651, 665(10).

Assignments 14 and 15 allege error in the court allowing assistant attorney general Roberts to make certain arguments and statements in his closing argument. The assignments do not prove themselves. The alleged statements and arguments are not preserved in the transcript and are not before us for review. State v. Gaddy, Mo.Sup., 261 S.W.2d 65; State v. Parrish, Mo.Sup., 214 S.W.2d 558, 560(6).

Assignment No. 16 is that the court erred in giving Instruction No. 4, because there was not sufficient evidence to fully support the finding of first degree murder. We need not rule the assignment. Defendant was not convicted of murder in the first degree, but only of murder in the second degree. State v. McHarness, Mo. Sup., 255 S.W.2d 826, 829(4); State v. Sterling, Mo.Sup., 72 S.W.2d 70; State v. Porter, 276 Mo. 387, 207 S.W. 774.

Assignment No. 17 is that the court erred in giving Instruction No. 5 as it is not a proper statement of the law. In what respects and why is not stated in the motion. The assignment is too general and indefinite to meet the requirements of Sup.Ct. Rule 27.20, Section 547.030, supra. State v. Todd, 342 Mo. 601, 116 S.W.2d 113, 116; State v. Tharp, 334 Mo. 46, 64

S.W.2d 249, 253; State v. Campbell, Mo. Sup., 84 S.W.2d 618, 620(3). The assignment is overruled.

■■■ Assignment No. 18 is that the court erred in giving Instruction No. 6 (on manslaughter) "for the reason that there is no evidence whatever to support statements that are in there." The instruction covers a full page of the transcript and the specific statements intended to be referred to are not designated in any manner. It is further said that the instruction "tends to confuse the jury and the issues." In what respects and why is not pointed out in the motion. The further contention in the motion that the state's evidence was that Talley was stabbed while in bed and defendant's evidence was that defendant was trying to escape prior to inflicting the mortal wound does not aid the assignment. The assignment is too general and indefinite to meet the requirements of Sup.Ct. Rule 27.20, Section 547.030, supra. State v. Kelly, Mo.Sup., 107 S.W.2d 19, 21(7); State v. Todd, supra; State v. Tharp, supra; State v. Campbell, supra. Even if this manslaughter instruction is without evidence to support it, the defendant may not complain thereof, because he has not been prejudiced thereby. State v. Brotherton, Mo.Sup., 266 S.W.2d 712, 717; State v. Preston, Mo.Sup., 184 S.W.2d 1015, 1017.

■■■ Assignment No. 19 is that the court erred in giving Instruction No. 7, because it is an abstract statement of the law. Abstract instructions are usually undesirable in criminal cases. State v. Martin Mo.Sup., 260 S.W.2d 536, 540. There is no assignment here, however, that the abstract statement of the law as contained in this instruction is in anywise erroneous, misleading, prejudicial or not applicable to the issues. While it is not good practice to give such instructions, the mere fact that it was an abstract statement of the law does not make the giving of it reversible error. State v. Graves, 352 Mo. 1102, 182 S.W.2d 46, 57; State v. Dowling, 360 Mo. 746, 230 S.W.2d 691, 694.

■■■ Assignment No. 20 is that the court erred in giving Instruction No. 8, "because there is no evidence to show that there was a killing because of provocation, but was either done when defendant was attacked by the deceased, or while deceased was in the bed." The instruction defined "sudden heat of passion" and stated the basis for reducing the alleged crime from murder to manslaughter, to wit, "that the killing must be done upon the instant the provocation is given, before the blood has time to cool * * *." There is no assignment that the instruction was prejudicial to defendant and, in effect, it was a part of the manslaughter instruction dealing with a lesser offense than the one of which defendant was convicted. Assuming that there was no evidence to support the instruction, defendant was not convicted of the offense to which it was directed and he cannot complain of an instruction as erroneously authorizing the jury to convict him of a lesser offense, even if such lesser offense was not sustained by the evidence. State v. Brotherton, supra; State v. Preston, supra.

Assignments Nos. 18 and 20 do not require a determination of whether a manslaughter instruction was required, however, defendant's evidence tended to show that he went into Talley's bedroom to remonstrate with Talley and a sudden personal combat ensued in which Talley threw something at him and placed a blanket over his head and as a result of a fight growing out of what defendant believed to be the relationship between Talley and defendant's wife, Talley was killed. See Section 559.070 RSMo 1949; State v. Forsythe, Mo.Sup., 251 S.W.2d 17, 19; State v. Ferguson, 353 Mo. 46, 182 S.W.2d 38.

■■■ The remaining assignments are that the court erred "in giving Instruction No. 9, because it is confusing and limits the right of self-defense"; that the court erred in admitting illegal, irrelevant testimony depriving the defendant of his constitutional rights; and that the court erred "in admitting the purported confession of

the defendant in evidence and in causing the same to be read to the jury." These assignments are insufficient to preserve anything for appellate review. The alleged errors are not set forth in detail and with particularity and the "specific grounds or causes therefor" are not pointed out. The grounds or reasons why Instruction No. 9 is claimed to be confusing, or why and wherein it is claimed that the instruction limits the right of self-defense, are not stated. What testimony is claimed to be illegal and irrelevant is not designated with particularity. No grounds of error in admitting the confession of defendant in evidence is stated. These assignments are too general, indefinite and uncertain to require further consideration. They are overruled.

Further, we have examined the information and determined that it is sufficient. The verdict is in proper form and responsive to the issues presented. The record shows that allocution was afforded and that judgment and sentence were duly pronounced.

The judgment should be affirmed. It is so ordered.

All concur.